UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

—————————————————————————X
                                  :

RALPH REDDING,                    :

                  :

        Plaintiff,       :

             :        No. 24 Civ. ____

     v.              :

             :

THE CITY OF NEW ROCHELLE,    :        COMPLAINT AND
DETECTIVE CLAUDIO CARPANO,   :        JURY TRIAL DEMAND
DETECTIVE TERRENCE FUDGE,    :
DETECTIVE MICHAEL MESSINA,    :
"JOHN/JANE DOE NEW ROCHELLE POLICE :
DEPARTMENT DETECTIVES/OFFICERS  :
NOS. 1–10"           :

             :

        Defendants.    :

             :
—————————————————————————X

Plaintiff RALPH REDDING ("Plaintiff") by and through his attorneys, Emery Celli Brinckerhoff Abady Ward & Maazel LLP and Rothman, Schneider, Soloway & Stern, LLP, complaining of the Defendants, respectfully alleges, upon information and belief, as follows:

## NATURE OF ACTION

1.     This is a civil rights action, pursuant to 42 U.S.C. §§ 1983 and 1988, the United States Constitution, and New York state law, seeking monetary damages for Plaintiff, Ralph REDDING, for his wrongful prosecution, conviction, and imprisonment based on a 2010 home invasion robbery he did not commit.

2.     Plaintiff spent more than 12 years in prison before the Conviction Review Unit of the Westchester County District Attorney's Office ("WCDAO") moved to vacate his conviction pursuant to New York Criminal Procedure Law 440.10(h) and dismiss the indictment against him.

3.      After conducting a year-long investigation, the WCDAO concluded that
detectives from the New Rochelle Police Department ("NRPD") withheld significant *Brady*
material that undermined the good faith and thoroughness of the police investigation, the
credibility of several key prosecution witnesses, and prevented the WCDAO and the defense
from investigating alternative suspects and theories of the crime. The WCDAO also concluded
that the lead detective, Defendant Claudio CARPANO (hereinafter "CARPANO"), lied to
prosecutors about the police investigation and testified falsely at the pre-trial *Wade* hearing.
Critically, the WCDAO concluded that had the *Brady* information and evidence been provided to
the defense, there is a reasonable probability that Plaintiff's trial would have resulted in a
different outcome and, therefore, Mr. REDDING's Fourth, Fifth, Sixth, and Fourteenth
Amendment Rights under the U.S. Constitution and his rights under art. I, sec. 6 of the New York
Constitution were violated.

4.      In addition to these egregious *Brady* violations, NRPD detectives knowingly
manufactured false identification evidence against Mr. REDDING by using unduly suggestive
photo identification procedures to obtain false positive identifications of Mr. REDDING from
several witnesses who had provided descriptions of the perpetrator that did not resemble him.
This unreliable and unfairly obtained false identification evidence was the only basis for Mr.
REDDING's arrest and subsequent prosecution.

5.      The egregious misconduct committed by members of the NRPD caused Plaintiff's
malicious prosecution and wrongful conviction. This lawsuit seeks to hold them accountable.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

6.      This action arises under 42 U.S.C. §§ 1983 and 1988, the United States

Constitution, and under the common law of the State of New York.

7.      Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343, and by

principles of pendent jurisdiction.

8.      Venue is proper in this Court under 28 U.S.C. § 1391.

9.      On or about May 10, 2023, Plaintiff served upon Defendant City of New Rochelle

(hereinafter "CITY") timely notice of the present claims as required by New York General

Municipal Law §§ 50-e.

10.      By letter dated May 25, 2023, Defendant CITY through its representative,

Sedgwick Claims Management Services, Inc. rejected Plaintiff's notice of claim, and opted not

to conduct a 50H hearing.

11.      This action has been commenced within one year and 90 days of the accrual of

Plaintiff's causes of action.

12.      Plaintiff has duly complied with all the conditions precedent to the

commencement of this action.

## THE PARTIES

13.      Plaintiff Ralph REDDING is a citizen of the United States, and currently resides

in the State of New York.

14.      Defendant CITY OF NEW ROCHELLE ("CITY") is a municipal corporation,

fully organized and existing under and by virtue of the laws of the State of New York and is

located within the confines of the Southern District of New York. The New Rochelle Police

Department ("NRPD") is an agency of the CITY. Detectives and officers employed by the NRPD

3

are employees of the CITY, which is legally responsible for torts they commit within the scope of their employment and/or under color of law.

15.     Defendant Claudio CARPANO was at all relevant times a detective employed by the NRPD, who acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State of New York and the CITY, and acted within the scope of his employment. He is sued in his individual and official capacities.

16.     Defendant Terrence FUDGE was at all relevant times a detective employed by the NRPD, who acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State of New York and the CITY, and acted within the scope of his employment. He is sued in his individual and official capacities.

17.     Defendant Michael MESSINA was at all relevant times a detective employed by the NRPD, who acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State of New York and the CITY, and acted within the scope of his employment. He is sued in his individual and official capacities.

18.     Defendants "JOHN/JANE DOE DETECTIVES/OFFICERS 1–10" were at all relevant times employed by the NRPD and acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State of New York and the CITY, and acted within the scope of their employment. They are sued in their individual and official capacities. These detectives' and officers' identities are currently unknown to Plaintiff but will be ascertainable through discovery.

4

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

**The Underlying Incident**

19.     On December 14, 2010, at approximately 12:30 a.m., three Black men in their 20s, one armed with a gun, committed a home invasion robbery of an Iona College student named David ("Dave") Marcus at 43 Treno Street in New Rochelle, New York.

20.     Upon information and belief, Marcus was targeted by the intruders because he was a known drug dealer who kept proceeds from his illegal trafficking in the room at his residence.

21.     At the time of the incident, Marcus, John "Jack" Havens, Veronica Guzman, Christopher Boccio, Michael Cupertino, Gerilyn Carberry, and Jordan Ramos—all Iona College students, with the exception of Boccio, who was Marcus's childhood friend—were present at 43 Treno Street.

22.     To gain entry into 43 Treno Street, the intruders employed a ruse. One man, the gunman, knocked on the front door holding a pizza box and announced, "Pizza."

23.     Jack Havens opened the door while shouting upstairs to his housemate, Marcus, to inquire whether he had ordered a pizza.

24.     Once inside, the man holding the pizza box displayed a revolver and pointed it at Havens's face, while his two accomplices rushed in behind him.

25.     The gunman—whom witnesses described to police that night as a dark-skinned Black male, 6'0" to 6'2", medium- to heavy-set, 230 pounds, stocky, wearing a black hoodie with a beanie underneath—ordered Guzman, Boccio, Cupertino, Carberry, and Ramos, who were in the first floor living room, to be quiet and demanded to be taken to "Dave." Havens told him that "Dave" was in a bedroom on the second floor.

26.     The gunman and one of the other men—who witnesses described as a light-skinned Black male, 5'10" to 5'11", skinnier, 180 pounds, wearing a gray hoodie with a beanie underneath and black clothes—escorted Havens up the stairs.

27.     The third intruder—who witnesses described as a Black male, "shortest of the bunch," wearing a gray sweater or navy blue jeans and sweatshirt or all black—remained downstairs keeping watch over the other occupants.

28.     Once upstairs, Havens knocked on Marcus's bedroom door. When Marcus did not immediately open the door, the gunman threatened to shoot Havens in the head. Havens implored Marcus to open the door. Marcus complied.

29.     After Marcus opened the door, the gunman pushed Havens down the stairs to join the others.

30.     The gunman demanded money from Marcus, while the other man searched the bedroom, finding a locked cashbox in the closet, which he seized.

31.     The gunman, at the direction of his accomplice, hit Marcus on the head with the pistol before all three men fled 43 Treno with the locked cashbox.

32.     Marcus suffered a laceration to his head for which he received treatment at a local hospital.

33.     The entire incident took somewhere between three and five minutes.

34.     Marcus informed investigating police, and testified at trial, that the cashbox taken contained approximately $800.

**New Rochelle Police Department Investigation**

35.     At 12:37 a.m., police dispatch received a 911 call reporting the robbery at 43 Treno Street.

36.     NRPD officers arrived at the scene and began taking statements from the witnesses.

37.     Defendant Detective Claudio CARPANO from the General Investigations Unit of the New Rochelle Police Department was assigned as the lead detective.

38.     CARPANO was already off duty when the 911 call was received, but responded to 43 Treno Street that night upon being called back to work.

39.     On the night of the incident, CARPANO knew the descriptions of the perpetrators (*see* ¶¶ 25, 26, 27, *supra*) that had been provided by the witnesses and were documented in police reports.

40.     One of the first investigative steps taken by CARPANO was to determine whether the local pizzeria, Cannone's Pizza, had a video surveillance system that captured the individual or individuals who used the empty pizza box to gain entry into 43 Treno Street.

41.     CARPANO spoke to the manager of Cannone's Pizza who provided him with two color video clips from the night of the crime from two different cameras.

42.     The first clip, from a camera positioned across from the cash register, primarily captured the feet and legs of people at the counter.

43.     The second clip, from a camera with a broader perspective, shows customers in their entirety. It shows two white men who appear to be in their 20s entering the pizzeria through a door on the north side. An employee at the counter speaks to the two white men and gives each an empty pizza box before they leave through the north entrance. The footage captures the faces

7

of the two white men and by virtue of a "unique colorful pair of sneakers" worn by one of them, CARPANO determined that the individual with the colorful footwear was an Iona college student by the name of Gregory Black.

44.     This discovery, and other evidence, led CARPANO and the other Individual Defendants to suspect that Black had set up Marcus to be robbed. Upon information and belief, CARPANO issued a system-wide notification that Black was wanted for questioning.

45.     The second clip also shows that 45 seconds after the two white men exit Cannone's through the north entrance, a Black man enters the restaurant through the south entrance, directly across from the register. After speaking with an employee for about 20 seconds, the employee gives the Black man a larger box than the ones previously given to the white men. Police would learn in late January 2011 that Steven Wallace, another Iona College student, was the individual in this portion of the second clip (*see* ¶¶ 58–63, *infra*).

46.     Defendant CARPANO and the other Individual Defendants knowingly and willfully did not disclose the surveillance video clips from Cannone's to WCDAO prosecutors. As a result, they were not turned over to Plaintiff and his defense attorney. The only evidence that CARPANO provided to prosecutors regarding the surveillance videos was a single black and white still image from the first clip showing Wallace from the neck down holding an empty pizza box.

47.     Additionally, Defendant CARPANO and the other Individual Defendants knowingly and willfully did not disclose to WCDAO prosecutors that Gregory Black was one of the white males in Cannone's surveillance video, and as a result this information was not turned over to Plaintiff and his defense attorney.

48.     As part of his investigation into Black's suspicious conduct, Carpano accessed his social media account and found photos of his Black male "associates." Carpano then printed the photos and, upon information and belief, some were placed in the highly unorthodox, unduly suggestive photo identification packets and shown to the witnesses.

49.     One photo that was shown to witnesses was a group photo containing a man named Sean Gray (nicknamed "YG") and Gray's cousin, Chad Jones. Several witnesses later identified Gray as the man who went upstairs with the gunman and Jones as the man who stayed downstairs.

50.     There were no photos of Plaintiff on Black's social media and there was no evidence whatsoever that Plaintiff and Black knew each other.[1]

51.     Despite there being no photos of Mr. REDDING on Black's social media and no evidence that either man knew the other, Defendant CARPANO would later falsely inform prosecutors that he identified Plaintiff as a suspect from Black's social media.

52.     In fact, Defendant CARPANO decided to target Ralph REDDING as a suspect after asking members of the NRPD "gang unit" and its Narcotics Division who they thought the gunman could be. Defendant Detective Terrence FUDGE told CARPANO that he believed Ralph REDDING was the type of person who was capable of committing such a crime.

53.     Based solely on Defendant FUDGE's baseless belief that Mr. REDDING could be the gunman, Defendant CARPANO began investigating Mr. REDDING as his main suspect.

54.     Notwithstanding the fact that Mr. REDDING was 5'7" to 5'8" and weighed 170 pounds and therefore did not match the witnesses' descriptions of the gunman (*see* ¶ 25, *supra*),

---

[1] While Mr. Redding grew up in the same general area as Sean Gray and Chad Jones and they knew each other tangentially, there was no evidence that they were closely acquainted.

Defendants CARPANO, FUDGE and MESSINA retrieved a "booking" photo of Mr. REDDING from the NRPD database and placed it in photo identification packets to show to the witnesses.

55.     In the case of some witnesses, Defendants CARPANO, FUDGE and MESSINA chose "filler" photos which displayed faces against charcoal grey backgrounds. Mr. REDDING's booking photo, by contrast, was fuzzy and out of focus with a grey shadowy aura around his profile that made his skin appear much darker than his actual skin color. Additionally, it had a white background that made the photo stand out in relation to the other photographs used in the photo identification packets that the Defendants showed to witnesses.

56.     Moreover, several of the filler photos were of noticeably lighter-skinned Black men, and two appeared to be light-skinned Hispanic men. Additionally, some of the same filler photos that were used in Sean Gray's photo packets that were shown to witnesses were also used in Mr. REDDING's packets, even though the two men looked nothing alike.

57.     Upon information and belief, Defendants CARPANO, FUDGE and MESSINA purposely chose filler photos that did not resemble Mr. REDDING and backgrounds that were grey or charcoal instead of white to improperly influence witnesses to falsely identify him.

58.     On January 27, 2011, six weeks after the crime, Steven Wallace, accompanied by his father, appeared at NRPD headquarters and personally identified himself to police as the pizza box purchaser.

59.     The previous day, Jack Havens had contacted Wallace and told him that "they" saw him on the pizzeria's surveillance video. Havens and Wallace met and conversed at 43 Treno Street before Wallace's meeting with Detective CARPANO the next day.

60.      Wallace told police, and later testified at trial, that on the night of the robbery, he was walking towards a deli near North Avenue when "a black sedan with four passengers" pulled

10

up next to him. The front passenger gave Wallace $10 and asked him to buy a pizza box at Cannone's Pizzeria, which was across the street. Wallace said he paid $1 for the box, walked back to the side street where the black sedan was parked and gave the front passenger the box.

61.     The Individual Defendants knew as early as January 7, 2011 that Gregory Black owned and drove a black sedan.

62.     Significantly, Wallace described the front passenger—who police purported was Mr. REDDING—as having a full beard and an inch-length Ceasar haircut, with no braids. None of the Treno Street witnesses described the gunman with facial hair and Mr. REDDING's arrest photo, which was taken on January 18, 2011, approximately one month after the crime, showed him with braided hair.

63.     For the meeting with Wallace, Detectives CARPANO and MESSINA prepared an unduly suggestive photo identification packet of eight photos containing Plaintiff's mugshot and seven filler photos obtained from social media, and showed it to Wallace. CARPANO guided Wallace to identify Mr. REDDING's photo and told him during the viewing that Mr. REDDING was a "scary looking guy." As a result, Wallace selected Mr. REDDING's photo as the person who asked him to buy the pizza box.

64.     In the six weeks after the crime, Defendant CARPANO and other Individual Defendants showed variations of the above described unduly suggestive identification packets to five witnesses—Marcus and Boccio on December 20, 2010, Havens on January 6, 2011, Guzman on January 19, 2011, and Wallace on January 27, 2011. All five witnesses falsely identified Mr. REDDING in the unduly suggestive photo identification procedures.

65.     No lineup identification procedures were conducted.

**Additional *Brady* Evidence and Information Concerning Black that the Individual Defendants Withheld from the WCDAO and Defense**

66.     On January 7, 2011, ten days before Plaintiff's arrest, Gregory Black was detained by NRPD Officer Wolf, Detective Fernandez, and Sergeant Fagan outside of 43 Treno Street. Defendants CARPANO and MESSINA responded to the scene and transported Black to police headquarters for questioning.

67.     At police headquarters, CARPANO and MESSINA accused Black of being involved in the robbery and informed him that they knew he obtained an empty pizza box shortly before the robbery because they saw him on Cannone's surveillance video. After the interrogation, Defendants CARPANO and MESSINA released Black.

68.     Defendants CARPANO, MESSINA, and the other Individual Defendants purposely did not disclose anything about this interrogation of Black to WCDAO prosecutors, including neglecting to mention it was conducted at all.

69.     A narrative report and field interview worksheet regarding the police interaction with Black outside of 43 Treno Street were generated, but these documents too were withheld from the WCDAO and Plaintiff.

**Withheld *Brady* Evidence of NRPD Investigation into Suspected Drug Activity at 43 Treno Street**

70.     In December 2010, around the time of the home invasion, a confidential informant told NRPD detectives that suspicious packages from California, weighing two pounds each, were frequently being delivered to 43 Treno Street.

71.     On December 17, 2010, three days after the robbery, U.S. Postal Inspector Zajo Hoti advised NRPD Detective Glen Spinner that he would alert the NRPD of any packages being sent from California to 43 Treno Street.

72.     On the same day that CARPANO and MESSINA interrogated Black at police headquarters, Detective Spinner swore in a search warrant affidavit that he had probable cause to believe a search of 43 Treno Street would recover illegal drugs. A Suffolk County Supreme Court judge signed the search warrant.

73.     The search warrant was executed at 43 Treno Street on January 7, 2011 (the same day that CARPANO and MESSINA interrogated Black) by members of the NRPD. They recovered a small quantity of marijuana from a coffee table in the living room where three people (one who later testified against Plaintiff at trial) were sitting.

74.     Members of the NRPD, in their discretion, did not arrest or charge anyone for possession of the marijuana recovered during the execution of the search warrant.

75.     Members of the NRPD continued to surveil 43 Treno Street for one year and intercepted another package from California that a K9 member of the NRPD detected contained drugs.

76.     Defendant CARPANO and the other Individual Defendants knew about the search warrant, the results of its execution, and the individuals who were present. They also knew about the additional package of drugs that was intercepted, and that the NRPD was surveilling 43 Treno Street for a year due to suspected drug activity. However, they knowingly and willfully withheld this information and documents pertaining to the same from WCDAO prosecutors. As a result, Plaintiff and his attorney did not have the information and documents for use during their investigation or at trial.

77.     This *Brady* evidence would have severely undermined the credibility of David Marcus and Jack Havens, who were the targets of the narcotics investigation. The evidence would also have seriously undermined the prosecution's argument, and Marcus's trial testimony,

that he was targeted because he was known around town to be wealthy and generous as opposed

to the truth—that he was targeted because he was known to keep proceeds of his illegal drug

activity in his room at 43 Treno Street.

**Plaintiff's False Arrest and Prosecution**

78.     Plaintiff was falsely arrested on January 17, 2011, and accused of being the

gunman at the home invasion robbery at 43 Treno Street.

79.     Plaintiff was indicted on February 14, 2011 based solely on the false identification

evidence that was manufactured by the Individual Defendant NRPD detectives.

80.     No forensic, video, or confession evidence implicated Plaintiff in the crime.

81.     The Individual Defendants withheld critical *Brady* evidence that seriously tainted

and undermined the police investigation and any probable cause determination, from prosecutors

who presented the case to the Grand Jury and from the grand jurors who voted a True Bill.

82.     Plaintiff stated his innocence from the inception of the case and has never

wavered.

83.     Plaintiff could not possibly have been the gunman because he was ***not even in***

***New Rochelle*** at the time of the incident.

84.     At the time of the incident, Mr. REDDING was living in Hempstead, Long Island

with his aunt, Wendy Taylor, and her family, including her son Kashiem Johnson, who testified at

trial that Plaintiff was with him at home in Hempstead, approximately 30 miles away from 43

Treno Steet, New Rochelle, at the time of the crime.

85.     Additionally, Plaintiff was 170 pounds and 5'8'' inches tall and could not possibly

have been the 6' to 6'2" tall and 230-pound perpetrator that the witnesses described.

86.     Despite the discrepancies between Plaintiff's appearance and that of the gunman and his alibi defense, on November 9, 2011, a jury convicted Plaintiff of two counts of burglary in the first degree, robbery in the first degree, robbery in the second degree, two counts of assault in the second degree, and assault in the third degree.

87.     As discussed, had the defense and jury known about the critical *Brady* evidence that the Individual Defendants withheld that undermined the police investigation and the prosecution's theory of the case, there is a reasonable probability that Plaintiff would have been acquitted.

88.     Indeed, had the WCDAO known about the *Brady* evidence and information that Defendant CARPANO and the other Individual Defendants withheld, there is a reasonable probability that the WCDAO office would have declined to prosecute Mr. REDDING.

89.     On February 23, 20212, Judge James W. Hubert sentenced Mr. REDDING to an aggregate term of twelve years imprisonment plus five years post-release supervision.

90.     Mr. REDDING served this term of imprisonment in full.

91.     Mr. REDDING protested his innocence from the inception of the case and through his arduous incarceration. He filed a direct appeal, C.P.L.§ 440 motions to vacate his conviction, and a federal habeas corpus petition, which were all denied.

92.     Throughout his appeals, motions to vacate his conviction and federal habeas proceedings, the Individual Defendants continued to withhold the before-mentioned *Brady* information and material from the WCDAO and Plaintiff.

93.     In 2021, Mr. REDDING asked the newly created Conviction Review Unit of the Westchester District Attorney's Office (the "CRU") to review his case.

94.     The CRU conducted a thorough investigation of Plaintiff's case and concluded that NRPD detectives used unduly suggestive identification procedures to obtain false identifications against Mr. REDDING, lied to prosecutors from the WCDAO about the surveillance video that undermined the witnesses and the prosecution's theory of the case against Plaintiff, and withheld critical *Brady* material about drug activity at 43 Treno Street that would have significantly undercut the credibility of two key prosecution witnesses.

95.     As a result of the CRU's discoveries, counsel for Plaintiff and the WCDAO CRU jointly moved to vacate his conviction pursuant to CPL 440.10(h).

96.     On January 24, 2023, Judge Robert J. Neary vacated Plaintiff's conviction and ordered a new trial to be preceded by a new *Wade* hearing.

97.     On February 17, 2023, on motion by the WCDAO, the indictment against Plaintiff was dismissed by the Court.

**<u>NRPD's Plot to Falsely Arrest and Convict Plaintiff</u>**

98.     Plaintiff's false arrest and malicious prosecution was engineered by a series of corrupt acts and omissions willfully committed by NRPD detectives Claudio CARPANO, now retired, Terrence FUDGE, Michael MESSINA, and other members of the NRPD.

99.     ***Not a shred of forensic evidence*** connected Plaintiff to the crime.

100.    Nevertheless, Defendant CARPANO and the other Individual Defendants placed Plaintiff's photograph in multiple highly suggestive photo "packets," which he and other NRPD detectives displayed to witnesses in the days and weeks following the incident, knowing that these photo packets were highly suggestive and would result in false positive identifications of Mr. REDDING.

16

101.    CARPANO testified falsely at the *Wade* hearing that Plaintiff's photograph was included because he allegedly received an anonymous phone tip that "YG and KO" (whom the detectives claimed to be Plaintiff) were involved in the 43 Treno robbery.

102.    No police record of the alleged anonymous tip CARPANO claimed to receive was ever produced. In fact, the first time it was mentioned was ten months after the home invasion, in October 2012 during cross-examination of CARPANO at the pre-trial *Wade* hearing. In that testimony, CARPANO could not say how he received this purported tip.

103.    Multiple instances of egregious police misconduct, as detailed above, resulted in Plaintiff's wrongful arrest, prosecution, conviction, and imprisonment. The CITY and the Individual Defendants must be held accountable for failing to follow established police procedures, improperly influencing witnesses to provide false identifications, intentionally failing to pursue leads that would have established Plaintiff's innocence, and withholding crucially important *Brady* evidence and information undermining the credibility of prosecution witnesses from prosecutors, the grand jury, and the defense.

104.    This highly critical *Brady* material—if known to the prosecution, grand jury, and defense—would likely have changed (i) the WCDAO's decision to prosecute Plaintiff; (ii) the grand jury's decision to vote a True Bill; and (iii) the trial jury's guilty verdict.

105.    Defendants CARPANO, FUDGE, MESSINA, and other members of the NRPD committed the aforesaid multiple, egregious acts and omissions knowingly, willfully, and maliciously with utter disregard for the truth and for Plaintiff's innocence.

106.    As a result of the unconstitutional, egregious, and unlawful deprivation of Plaintiff's rights, including his illegal arrest, malicious prosecution, unjust conviction and lengthy imprisonment, Plaintiff has suffered severe and permanent damage, including loss of

liberty, lost wages and earning potential, loss of reputation, and physical and psychological injuries.

**<u>Plaintiff's Damages and Injuries</u>**

107.    As a direct and proximate consequence of the Defendants' actions, Plaintiff suffered 12 years of imprisonment.

108.    During his incarceration, Plaintiff suffered abusive treatment and harassment by correction officers, sustained serious physical injuries, including a slashing by another inmate, endured extended time periods in solitary confinement, and was denied adequate medical treatment.

109.    Plaintiff also suffered severe emotional and mental anguish and pain as a result of being punished for crimes he did not commit, harassment by correction officers, and dehumanizing treatment by prison staff. He suffered from lack of privacy, humiliation, harsh prison conditions, and feared he would die in prison. He was denied adequate treatment for his emotional injuries while incarcerated and continues to suffer mental and emotional anguish to this day.

110.    Plaintiff was also denied the opportunity to pursue normal relationships with, and to enjoy the companionship of, his family members and friends.

111.    Plaintiff was denied years of gainful employment and income. His incarceration interrupted and arrested his employment, seniority and career advancement.

112.    Plaintiff has been publicly shamed, disgraced, ridiculed, and humiliated. Nothing can undo the reputational damage Plaintiff has sustained.

113.    Plaintiff was denied fundamental constitutional rights, his liberty, and has lost his faith in the American justice system.

**FIRST CAUSE OF ACTION**
**(42 U.S.C. § 1983, Malicious Prosecution Under the Fourth, Fifth, and**
**Fourteenth Amendments; Against the Individual Defendants)**

114.    Plaintiff repeats and realleges each and every allegation contained in the

preceding paragraphs as if fully set forth herein.

115.    By virtue of the foregoing, the Individual Defendants are liable to Plaintiff for

damages, pursuant to 42 U.S.C. § 1983, for knowingly, willfully, and maliciously causing

Plaintiff to be seized, prosecuted, and deprived of his liberty without probable cause, in violation

of his right to be free of unreasonable search and seizure pursuant to the Fourth and Fourteenth

Amendments to the United States Constitution, and to procedural due process pursuant to the

Fifth and Fourteenth Amendments.

116.    The Individual Defendants are also liable to Plaintiff under 42 U.S.C. § 1983 for

knowingly, willfully, and maliciously depriving Plaintiff of his liberty, without probable cause,

through outrageous conduct that shocks the conscience, in violation of Plaintiff's right to

substantive due process pursuant to the Fifth and Fourteenth Amendments to the United States

Constitution.

**SECOND CAUSE OF ACTION**
**(42 U.S.C. § 1983; Denial of Due Process and a Fair Trial Under the Fifth,**
**and Fourteenth Amendments By Manufacturing False Identification Evidence; Against the**
**Individual Defendants)**

117.    Plaintiff repeats and realleges each and every allegation contained in the

preceding paragraphs as if fully set forth herein.

118.    The Individual Defendants deliberately manufactured false identification evidence

against Plaintiff.

19

119.    The Individual Defendants did so knowing that such evidence was likely to be relied upon by the jury at trial, and in fact the evidence was relied upon by the jury, thereby proximately causing Plaintiff's conviction.

120.    In addition, the Individual Defendants did so knowing such evidence was likely to be relied upon by the court that was responsible for setting or denying bail, by the prosecutors who decided whether to prosecute, and by the grand jury that decided whether to indict, and in fact the evidence was relied upon by these entities, thereby proximately causing Plaintiff to be deprived of his liberty and prosecuted despite there being no probable cause to prosecute.

121.    The Individual Defendants acted under pretense and color of state law. Their acts were beyond the scope of their jurisdiction, without authority of law, and an abuse of their powers. They acted with the specific intent to deprive Plaintiff of his constitutional rights.

122.    The Individual Defendants thereby violated Plaintiff's right to procedural and substantive due process and to a fair trial pursuant to the Fifth and Fourteenth Amendments of the United States Constitution, and are liable to Plaintiff for damages under 42 U.S.C. § 1983.

### THIRD CAUSE OF ACTION
**(42 U.S.C. § 1983; Denial of Due Process and a Fair Trial Under the Fifth, Sixth, and Fourteenth Amendments by Withholding *Brady* Material; Against the Individual Defendants)**

123.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

124.    The Individual Defendants, pursuant to the rule established in *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and the due process and fair trial provisions of the Fifth, Sixth, and Fourteenth Amendments, had an absolute constitutional obligation to disclose to the prosecution, and to the defense, all evidence and information in their possession or knowledge that tended to favor Plaintiff, including, but not limited to, the color

20

video footage from Cannone's pizzeria and the nature and status of the ongoing narcotics

distribution investigation against Marcus and Havens, key prosecution witnesses at Plaintiff's

trial.

125.    The Individual Defendants knowingly, willfully, intentionally, recklessly, and/or

negligently failed to disclose such evidence and information.

126.    The Individual Defendants acted under pretense and color of state law. Their acts

were beyond the scope of their jurisdiction, without authority of law, and in abuse of their

powers. They acted with the specific intent to deprive Plaintiff of his constitutional rights.

127.    The Individual Defendants thereby violated Plaintiff's right to procedural and

substantive due process and to a fair trial pursuant to the Fifth, Sixth and Fourteenth

Amendments to the United States Constitution, and are liable to Plaintiff for damages under 42

U.S.C. § 1983.

### FOURTH CAUSE OF ACTION
**(Malicious Prosecution Under State Law; Against All Defendants)**

128.    Plaintiff repeats and realleges each and every allegation contained in the

preceding paragraphs as if fully set forth herein.

129.    By virtue of the foregoing, the Individual Defendants, acting in concert with each

other and with additional persons for whose acts they are liable, initiated, continued, and/or

caused the initiation or continuation of, criminal proceedings against Plaintiff.

130.    The criminal proceedings terminated in Plaintiff's favor.

131.    There was no probable cause for the commencement or the continuation of the

criminal proceedings.

132.    The Individual Defendants acted with actual malice.

21

133.    Defendant CITY is liable under the principle of *respondeat superior*.

**FIFTH CAUSE OF ACTION**
**(Negligent Hiring, Training and Supervision Under State Law;**
**Against Defendant City of New Rochelle)**

134.    Plaintiff repeats and realleges each and every allegation contained in the

preceding paragraphs as if fully set forth herein.

135.    By virtue of the foregoing, the CITY is liable to Plaintiff because of its

intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately hire,

train, supervise, and discipline its agents, servant, and/or employees employed by the NRPD

with regard to their aforementioned duties.

**JURY DEMAND**

136.    Plaintiff hereby demands trial by jury of all issues properly triable thereby.

**DAMAGES DEMAND**

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

a.  For compensatory damages;

b.  For punitive damages against each Individual Defendant;

c.  For reasonable attorneys' fees, together with costs and disbursements, pursuant to 42

U.S.C. § 1988 and to the inherent powers of this Court;

d.  For pre-judgment interest as allowed by law; and

e.  For such other and further relief as this Court may deem proper.


Dated: New York, New York
       February 9, 2024

                            EMERY CELLI BRINCKERHOFF
                            ABADY WARD & MAAZEL, LLP

                            By:    /s/ *Julia P. Kuan*

22

Julia P. Kuan
Sarah Mac Dougall
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5075
jkuan@ecbawm.com
smacdougall@ecbawm.com


ROTHMAN SCHNEIDER
SOLOWAY & STERN, LLP

By:      /s/ *Robert Soloway*
         Jeremy Schneider
         Robert Soloway
         100 Lafayette Street
         5th Floor
         New York, New York 10013
         (212) 571-5500
         jschneider@rssslaw.com
         rsoloway@rssslaw.com